THOMAS K. GLENN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 108437.   Promulgated February 22, 1944.

*John E. McClure, Esq.*, for the petitioner.
*F. L. Van Haaften, Esq.*, for the respondent.

OPINION.

Disney, *Judge*: The major difference between the parties on the first issue, loss on liquidation of Investment Corporation, is whether such corporation should be recognized as an entity for the purpose of computing gain or loss to petitioner, resulting from the disposition of his stock of the corporation in liquidation proceedings.

It is the contention of the petitioner that Walhalla Investment Corporation had, and accomplished, a distinct business purpose, that is, to enable him to use its stock to obtain further collateral which petitioner could put up on his existing indebtedness and thus save his investment securities. The petitioner stresses that he could not directly use as collateral the properties which were put into the corporation, also the fact that he had no tax-saving motive and did not know that ne could save taxes, until after the liquidation had actually occurred. The respondent argues, in effect, that the whole transaction was unreal, that the corporation was, in effect, the *alter ego* of petitioner, and that no loss upon liquidation should be allowed.

It is the burden of the petitioner to show his right to the deduction claimed for loss, and therefore to demonstrate that the corporate entity here being analyzed should be recognized. We have found that there was no consideration of tax-saving motive in the formation or dissolution of the corporation.

We consider, then, the further facts presented. In brief, and in effect, the petitioner possessed several pieces of real estate, including his home, some life insurance, and Atlantic Steel Co. stock. The life insurance was already pledged to Piedmont. He was in financial difficulties. He placed the real property in a corporation and hypothecated the stock, with Piedmont, wholly owned by Woodruff, his long time business associate. (The transfer of the life insurance and the Atlantic Steel Co. stock to the corporation was apparently after the hypothecation of its stock to Piedmont, since it was after incorporation and original transfer, and the insurance changes were not acknowledged by the companies until much later.) By this means he secured the loan of 3,100 shares of Coca-Cola common stock. He already had 1,500 shares, borrowed from Piedmont on the collateral of life insurance of a cash surrender value of $62,769.21 and $218,000

face value of bonds, borrowed from Piedmont without security. As to whether he then actually put up the borrowed collateral with his other creditors the record is vague, and we can make no finding, the evidence merely being that he put "those up to supplement the collateral I had," which may refer, and seems to refer, to the hypothecation of the Investment Corporation shares to supplement the collateral which Piedmont had, i. e., the life insurance policies.

Upon reacquiring possession of the stock in January 1935, through payment of his loans, petitioner, having no further need for the corporation, took the necessary steps to dissolve it. In the liquidation proceedings that followed he received for his stock the same assets he had transferred to the corporation. The purpose for which the corporation was organized did not contemplate that he should receive anything else. The purpose was that the corporation should hold title to the real estate and such other property as petitioner might transfer to it.

The income tax return and capital stock tax return of the corporation, verified by the petitioner, give its business as that of "Holding Company," and "Real Estate Holding Company." It was obviously not a holding company in the usual sense, for it held no other companies or property. It appears plain, then, that the company was considered as merely holding the real estate, stock, and insurance. This is almost tantamount to an admission of mere agency of corporation for petitioner. The corporation never transacted any business and the petitioner does not so contend, except to say that its purpose was not just "the equivalent of business activity," but it was a business activity. The purpose, of course, could not itself be business activity.

Nothing of record indicates that petitioner ever intended the Investment Corporation to engage in business activities. At the time of the formation of the corporation, petitioner agreed to pay the taxes on, and assessments against, the real property and the organization expense, these payments to be in lieu of rent for the parcel occupied by petitioner as a residence. Petitioner paid such charges. The corporation had no income or expenses and functioned only as a record holder of real estate and stock and beneficiary of insurance on the life of its sole stockholder.

Though the corporation, in fact, transacted no business, the petitioner contends, nevertheless, that it served a business purpose. To sustain such thesis that such corporation served a business purpose, so that he may deduct a loss on its dissolution, it is logically incumbent upon the petitioner to demonstrate, at least, that the fact of incorporation (upon which, with dissolution, petitioner relies for a deduction) itself had and served a business purpose, that is, that the same result would not have come about without such incorporation. In analyz-

ing this situation, we note first that far the larger portion of the property originally turned over to the Investment Corporation and belonging to it at the date of the borrowing, and relied upon as reason for incorporation, consisted of the home of the petitioner. A home is a very personal thing. Inherently, the term suggests a negation of business purpose. The petitioner continued through the entire period of the life of the corporation to live in that home and to pay the taxes and expenses thereon. In such a situation, we may not without difficulty entertain the idea of metamorphosis of a home into a business entity. Also, the corporation possessed no property that the petitioner had not previously possessed. It had no greater financial foundation. Petitioner argues, however, in substance, that individually he could not have borrowed upon the property. The evidence on the point we consider insufficient to sustain it. As to why he did not put mortgages upon the properties, petitioner said: "Because I didn't want them." He also stated that, "It might have been embarrassing," because it was more difficult to mortgage all the property than it would be to put it into a company, that he formed a corporation "as a matter of convenience and business," that he was in an embarrassing situation, and that the use of the Investment Corporation enabled him to save his skin. This evidence, in our opinion, itself indicates that the reason for the formation of the corporation was personal, rather than financial, and fails to demonstrate that the incorporation itself actually was intended to, or did, save the petitioner's financial skin. In fact, the evidence is equivocal as to whether there really would have been embarrassment in mortgaging the properties. Such mortgages "might have been" embarrassing, but the mere contingency that there might have been such embarrassment should not tip greatly the scales of evidence. Actual embarrassment and reasons therefor are necessary proof of the point as to necessity for incorporation to place the real estate in usable collateral form.

There is evidence that nothing but listed stock could be used as collateral; but the record does not indicate that the stock of Investment Corporation when formed was listed anywhere, so that it is apparent that incorporation is not shown to effect a change. Though listed stock was borrowed from Piedmont, by pledging that of Investment Corporation, nothing of record demonstrates that the incorporation of Investment Corporation was necessary for such borrowing from Piedmont. That company had very recently loaned petitioner $218,000 value of bonds without any collateral, and had loaned him 1,500 shares of Coca-Cola International, worth about $222,500 on the security of life insurance of a cash surrender value of $69,769.21 in January 1933. In the absence of any evidence that Piedmont or its owner, Woodruff, required the incorporation, or would not have made the loan of col-

lateral without it, other more substantial reasons for the formation of the corporation are requisite to the establishment of the business purpose claimed to have been served thereby. ' So far as the record shows, it appears that either the loan from Piedmont was obtained upon the strength of the assets of the corporation, that is, the real properties which had at that time been placed in it by petitioner, or it was obtained on the personal word of the petitioner, or through the personal relationship between petitioner and Woodruff, the owner of Piedmont. In the latter case, the incorporation is seen neither to have nor to serve a business purpose, while in the former the corporation adds nothing to the value of the property, therefore contributes no business, but only a possibility of personal purpose or advantage.

The petitioner argues, however, that under *Moline Properties, Inc.* v. *Commissioner*, 319 U. S. 436, the corporation may merely serve the personal or undisclosed convenience of its creator, yet the 'entity be properly recognized. However, under the language of that case such is true, "so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation." Here there being no "carrying on of business by the corporation," that element of the quoted language is eliminated; yet, we find no purpose which is "the equivalent of business activity" in the mere fact that petitioner did not wish to mortgage the realty, and that it *might* have been embarrassing to him to mortgage the properties themselves, instead of incorporating them and doing the same thing with the stock of the corporation. It is to be noted that in the *Moline Properties* case the Court proceeded to find in fact that the corporation actually transacted various business matters, including "an unambiguous business venture of its own"; also sold property and filed income tax returns showing the transactions. The conclusion in the case is not founded on equivalency of corporate purpose to business purpose. Moreover, the individual was there seeking to avoid the effect of a corporation which he had set up for good reason—pressure from his creditor, and at its suggestion, and in part to secure an additional loan with which to pay taxes on the property mortgaged to the creditor. The Court says: "Business necessity, i. e., pressure from creditors, made petitioner's creation advantageous to Thompson." Even if the Court had not, in fact, found actual business activity by the corporation, and had in fact based its decision on the above facts as "equivalent of business activity," they are so essentially distinguishable from those here, where the creator of a corporation is seeking to use it for tax purposes, that we think the case is not of significance. *Higgins* v. *Smith*, 308 U. S. 473.

In *Interstate Transit Lines* v. *Commissioner*, 319 U. S. 590, also cited by the petitioner, the subsidiary corporation actually engaged in an

intrastate and interstate bus business and the issue turned upon a point other than the separate character of the corporation.

*National Investors Corporation* v. *Hoey*, 52 Fed. Supp. 556, strongly relied upon by petitioner, we find clearly distinguishable upon the facts; for therein, as the court points out, the corporation "actually functioned as a business enterprise for over a year." Among the business activities indicated, were that the corporation received cash dividends on securities held by it, distributed same as dividends; also that it had declared and paid a 100 percent stock dividend on its outstanding stock. In addition, the corporation had received the securities of three other corporations. These had been received from the plaintiff, under a plan to unite the plaintiff with the three affiliated corporations. When submitted to the stockholders of this corporation, the plan was rejected and thereafter the corporation, after doing business for about a year, as above suggested, was dissolved. Clearly in such a case, where the matter was not within the sole control of one person, but plans were subject to rejection by stockholders of three corporations, we find little similarity to the instant case. The corporation involved in *Brudno* v. *Commissioner*, 138 Fed. (2d) 779, actually engaged in business.

Other considerations impelling our conclusion in this matter are as follows: The petitioner on January 3, 1933, transferred the real estate to Investment Corporation, subject to a $56,000 mortgage in the deed of conveyance, and as a part of the consideration the Investment Corporation agreed to pay such encumbrance; yet, four days later, on January 7. 1933, petitioner himself paid off the mortgage. Plainly this is not dealing on a business basis, but a recognition that the corporation is a mere *alter ego*, its covenant with petitioner to pay the debt being disregarded. Petitioner was never reimbursed. The fact that an existing encumbrance was not assumed by the corporation formed was relied upon by the court in *United States* v. *Brager Building & Land Corporation*, 124 Fed. (2d) 349, as negation of business purpose in the corporation, and the same seems even more true here, where, though assumed by the corporation, the debt is immediately discharged by the creator of the corporation. Again petitioner in the formation of the corporation caused the passage of the bylaws that no agent or officer of the corporation could sell, encumber, or convey any corporate assets without previous authorization by the affirmative vote of the majority of the outstanding common stock. Since the petitioner owned all of such stock, except qualifying shares, he thus prevented any possibility of any transfer of any corporate stock. This smacks of very personal control and intent to guarantee the petitioner control of the situation, despite incorporation. The petitioner seems to have been very careful that incorporation would

deprive him of no control of the incorporated assets. Also, the informal manner in which the insurance and the Atlantic Steel Co. stock were transferred to Investment Corporation without indication of transfer of stock therefor, and the failure to list the Atlantic Steel stock as assets distributed, indicates an informal personal management of the corporation by the petitioner.

Also, we may not disregard the fact that the Atlantic Steel Co. stock and the life insurance appear to have been transferred to the corporation after the hypothecation of the stock to Piedmont. Therefore, such property was not necessary to the loan of the collateral, already accomplished. The principal element of petitioner's argument lies in the necessity for formation of corporation in order to borrow; yet we find a loss, upon dissolution, predicated upon property not in the corporation until after the borrowing. We note too that Piedmont already had the insurance as collateral for an earlier loan of much more than its value. Obviously incorporation was not necessary for hypothecation of the insurance. An element of informality in the transaction appears also in the fact that insurance policies of $211,000 were transferred to the corporation, yet the stipulation as to insurance distributed on dissolution shows only $111,000 insurance. Whether the company was on a cash or accrual basis appears to have been immaterial, in answering questions on income tax returns. The Atlantic Steel Co. stock does not appear in Investment Corporation balance sheets. Nothing but real estate there appears.

All of these facts are impelling to the conclusion that the entire transaction involved in the incorporation of the Investment Corporation was personal, rather than one of business. Though of course, it is well recognized that corporate entity will ordinarily be respected, it is equally settled that this is not true under many circumstances, and where upon examination of all of the circumstances it becomes clear that a true business function was not served by the corporate entity, it should not be respected. Lack of actual transaction of business is found reason for denying corporate entity in various cases, perhaps most notably in *Gregory* v. *Helvering*, 293 U. S. 465; also in *United States* v. *Brager Building & Land Corporation, supra*. Perceiving in this instance that petitioner must, therefore, rely upon a business purpose served, we find no proof of the service of such purpose sufficient to meet the fact that the petitioner emerged from the transaction with the same property as he held before, and, finding neither corporate business transacted nor business reason for the transaction, nor equivalent of business purpose or activity, but only suggestions of possible embarrassment, we think that the personal element here precludes a conclusion that the corporation should be recognized separately from the petitioner himself. There is no real distinction to

be made, we think, between the situation of petitioner here and petitioner in *North Jersey Title Ins. Co.* v. *Commissioner*, 84 Fed. (2d) 898, where the corporation was formed to hold title to property in order to avoid publicity, and where the court concluded that the only purpose of the corporation was to act as agent for its parent. Indeed, in that case the corporation did deal in the property, whereas here it did nothing but hold. See *Carling Holding Co.*, 41 B. T. A. 493; *Archibald R. Watson*, 42 B. T. A. 52.

Other reasons appear for denying deduction for loss sustained in the liquidation of the Investment Corporation. The Andrews Drive and Ponce de Leon Avenue properties were not held for investment purposes until 1929. There is no evidence of record of the fair market value of the properties at that time or at the time they were conveyed to the Investment Corporation for stock. See *Heiner* v. *Tindle*, 276 U. S. 582. Neither is there any evidence as to the cost or fair market value at any time of the Atlantic Steel Co. stock which was transferred to the Investment Corporation sometime after it was organized and was received by petitioner for stock in the liquidation proceedings. On this issue we sustain the respondent.

The position of the petitioner on the second issue is that the exchange of International stock for Coca-Cola Co. stock and the sale of 2,000 shares of the latter stock were parts of a single transaction resulting in a cash sale of International stock. The respondent argues that they were two separate and distinct transactions and should be taxed as such.

The argument of petitioner was fully considered in proceedings instituted by other stockholders of the two corporations who had made exchanges of stock of International for Coca-Cola Co. stock, followed by a sale of the newly acquired stock, and decided against the petitioners, *Gus T. Dodd*, 46 B. T. A. 7; affd., 131 Fed. (2d) 382 (the parties stipulated that the facts found in the *Dodd* case should be considered as facts herein—with a slight and immaterial exception).; *Estate of Emanuel Ulman*, 46 B. T. A. 517; affd., 136 Fed. (2d) 406; *George C. Woodruff*, 46 B. T. A. 727; affd., 131 Fed. (2d) 429. No new theories are presented by petitioner upon brief, and the cases he relies upon, with two exceptions, were cited by the petitioner in the *Dodd* case. The additional cases involved questions of whether steps in a plan of reorganization should be considered separately or as parts of one transaction. Like issues were present in some of the cases previously relied upon. The new citations shed no new light on the question. The stock here was received in a partial liquidation and later sold.

Petitioner testified that he sold the 2,000 shares of stock of the Coca-Cola Co. to the Equitable Co. and to obtain the stock for the sale was required to exchange shares of stock of International, and that

he would not have made the exchange without the intention of disposing of the Coca-Cola Co. stock. The inference of the testimony is that petitioner made a short sale of Coca-Cola Co. stock to the Equitable Co. Petitioner's books show sales of the stock after the exchange and only 1,000 shares through the Equitable Co. Assuming the deliveries of Coca-Cola Co. stock were covering transactions, the fact would not change the result. Short sales of Coca-Cola Co. stock were involved in the *Woodruff* case. Following that case, and the *Dodd* and *Ulman* cases, also *James S. Floyd*, 2 T. C. 744, we sustain the respondent on this issue.

*Decision will be entered under Rule 50.*