Max Lutz and Ruth Lutz, Husband and Wife, Petitioners, v. Commissioner. Ruth Lutz, Petitioner, v. Commissioner. Max Lutz, Petitioner, v. Commissioner.
Lutz v. Commissioner
Docket Nos. 59613, 59614, 59615.
United States Tax Court
T.C. Memo 1959-32; 1959 Tax Ct. Memo LEXIS 216; 18 T.C.M. (CCH) 152; T.C.M. (RIA) 59032; February 20, 1959
*216 Claiborne B. Gregory, Esq., 1603 Alamo National Building, San Antonio, Tex., and Elwood Cluck, Esq., for the petitioners. Charles J. Sullivan, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings respondent determined the following income tax deficiencies: Petitioner
Year
Deficiency
Max Lutz
1948
$79,520.32
Ruth Lutz
1948
79,520.32
Max and Ruth Lutz
1949
29,444.79
The deficiency notice for 1948 disallowed a loss of $269,452.18. After trial respondent discovered the amount in dispute was $274,346 but agreed not to request an increased deficiency. The questions presented are: (1) Whether petitioners sustained business losses or expenses of $274,346 and $73,396.91 in 1948 and 1949, respectively; more specifically, whether petitioners individually conducted certain business operations in 1948 and 1949 and may deduct the losses sustained therein; if not, whether petitioners' advances to controlled corporations and the payment or assumption of the same corporations' debts were deductible as ordinary and necessary business expenses. (2) Whether petitioners are entitled *217 to net operating loss carrybacks in 1948 and 1949 from 1949 and 1950, respectively. Petitioners' second alternative plea of a business bad debt deduction was abandoned in brief. Findings of Fact Certain facts were stipulated and are hereby found accordingly. Max Lutz, hereafter called petitioner, and Ruth Lutz were husband and wife residing in McAllen, Texas, during the years 1948 and 1949. They filed the following Federal income tax returns on an accrual method of accounting with the collector of internal revenue for the first district of Texas: Year
Filed by
Filing date
1948
Max Lutz
7/26/49
1948
Max Lutz
3/ 9/50
1948
Ruth Lutz
7/26/49
1948
Ruth Lutz
3/ 9/50
1949
Max and Ruth Lutz
9/15/50
In 1931, petitioner became a resident of the Rio Grande Valley of Texas, sometimes hereafter called the Valley. From 1931 to 1942 petitioner engaged in the business of buying and selling perishable agricultural produce as a broker. In 1942, petitioner commenced growing produce as well as buying produce for sale to his brokerage customers. Petitioner produced crops on land which he owned or leased and contracted with Valley farmers for crops produced *218 on their lands. He maintained an office in McAllen, Texas. Petitioner had a strong credit position which was necessary to operate his business. The farming operations consisted of planting and cultivating, and at maturity, harvesting and delivering the crop to the processing and packing sheds. All crops were processed before they were sold to commodity brokers. The processing of crops consisted of transporting crops from the field to sheds where they were washed, graded, iced, and packed into cartons or other containers to which was affixed a trade name or label indicating petitioner as the grower, processor and shipper. The crops were then placed on common carriers for shipment to commodity brokers throughout the United States. Petitioner's operations in the Valley continued from 1942 through the trial of this case in 1958. From 1943 through 1949, those operations which were not carried on by him as an individual were carried on as joint ventures or partnerships. In the joint ventures petitioner agreed to divide profits according to predetermined percentages and to bear the losses. Petitioner, in the conduct of his farming operations, made initial outlays of funds long before *219 he realized any return on the crops. He was paid when the crops were finally delivered and accepted. Petitioner could not lawfully engage in the business of buying and selling perishable agricultural produce without a license as a produce buyer and shipper issued by the United States Department of Agriculture under the provisions of the Perishable Agricultural Commodities Act, hereafter called the P.A.C.A. Petitioner obtained license number 78809 and held it during the years involved. In 1941 or 1942, petitioner commenced operations in Emmett and Nampa, Idaho, and Nyssa, Oregon, similar to those in the Valley. These consisted of farming, processing, packing, shipping and selling perishable agricultural produce. A separate set of books was kept for the farming operations at Nyssa, Oregon; the farming operations at Emmett, Idaho; the farming operations at Nampa, Idaho; and the packing plant at Nampa, Idaho. All phases of the business in Idaho and Oregon prior to 1948 were carried on in the name of petitioner. Produce was packed and shipped under his name and brand labels, and many of the drafts were drawn on buyers by petitioner personally. Petitioner used 9 different parcels of *220 property located in Canyon County, Idaho, and 1 parcel located in Malheur County, Oregon, in the Idaho and Oregon operations sometime during the period of 1941 through 1947. Petitioner's interests in these properties prior to 1948 were as follows: 7 leaseholds; 2 leaseholds with options to purchase, such options having been exercised by petitioner within a few days after the execution of the leasehold agreements; and a contract to purchase a fee simple interest. Karl Hostetler became associated with petitioner in the Idaho and Oregon operations in 1943. The produce processing and packing plant at Nampa, Idaho, was under Hostetler's supervision, and the farming operations at Nyssa, Oregon, were under the supervision of Glen Hoel, an employee of petitioner in the Valley. Petitioner paid Hostetler and Hoel a salary for their services and additionally agreed to pay them a percentage of the profits. During 1947, petitioner's employees discussed with him the possibility of incorporating the Idaho and Oregon operations in order that they might acquire an interest in the business. Prior to December 2, 1947, petitioner notified suppliers that he planned to incorporate the Idaho and Oregon *221 operations. At the direction of Hostetler, an Idaho attorney prepared articles of incorporation for the Idaho and Oregon operations which were divided into the following corporations: Lutz Produce Co., Inc., Lutz Farms Co., Inc., and L. & H. Produce Co., Inc., hereafter called Produce, Farms and L. & H., respectively. Sometime in December 1947, petitioner signed the articles of incorporation. On January 2, 1948, the articles of incorporation of Produce and Farms were filed under the laws of Idaho and the articles of incorporation of L. & H. were filed under the laws of Oregon. The latter were recorded in Malheur County, Oregon, on May 11, 1948. The books of Produce, Farms and L. & H. record the receipt on January 2, 1948 of certain assets used in petitioner's operations and the issuance of capital stock. According to entries in the books of the corporations, the following interests in capital stock were acquired by petitioner, Glenn Hoel, Harold Blomquist and Bernard Warntges: Stock Interest Acquired
Date
Individual
Produce
Farms
L. & H.
1/ 2/48
Petitioner
$30,000
$40,000
$30,000
5/ 4/48
Petitioner
38,700
16,700
32,100
1/29/48
Glenn Hoel
500
1/29/48
Harold Blomquist
3,900
5/ 4/48
Bernard Warntges
700
Total
$69,400
$56,700
$66,500
*222 The 1948 income tax returns of the three corporations show that Hostetler owned 1 per cent of the respective corporation's common stock. Not all the cash indicated was paid in by petitioner. A portion of notes payable due petitioner was transferred to the capital stock account. The officers of Produce, Farms and L. & H. during 1948 and 1949 were as follows: Produce
Farms
L. & H.
President
Petitioner
Petitioner
Hostetler
Vice-
president
Hostetler
Petitioner
Secretary
Hostetler
G. Hoel
Harold
Blomquist
Treasurer
Hostetler
G. Hoel
Harold
Blomquist
At Hostetler's direction, double-entry sets of accounting records were established for Produce, Farms and L. & H. immediately after their incorporation. The book balances for the 1947 Idaho and Oregon operations were carried forward into books labeled in the names of the corporations. Some of the accounting records of Produce and L. & H. consisted of a general ledger, general journal, sales journal, check register, payroll check register, draft record, material requisition journal, cash receipts journal, accounts payable register and an accounts payable journal. The accounting records *223 of Farms consisted of a general ledger and general journal in 1948. A cash receipts journal and check register were added in 1949. Employees of the corporations maintained these records in 1948 and 1949 under the direction of Hostetler. Transfers to Produce, Farms and L. & H. of petitioner's interests in personalty used in the Idaho and Oregon operations were accomplished by petitioner's execution on February 23, 1948 of bills of sale in favor of the three corporations. [1] Transfers to Produce, Farms and L. & H. of petitioner's interests in Idaho and Oregon realty during January and February 1948 were as follows: [2]
Date of
Assign-
Acknowl-
Interest
Owner of Record
Interests
ment
edgment
Assigned To
H. H. Orcutt, et ux.
Lease
1/7/48
2/23/48
Farms
Orcutt-Sparks
Lease
1/7/48
2/23/48
Farms
F. W. Jordon, et ux.
Lease
1/7/48
2/23/48
Farms
W. A. Sutton, et ux.
Lease
1/7/48
2/23/48
Farms
Peter Johnson, et ux.
Fee
*
2/23/48
Farms
Clifford Johnson, et ux.
Fee
*
2/23/48
Farms
Tiegs Bros.
Real Estate
*
2/23/48
Produce
Contract
Oregon Short Line R.R.
Lease
1/7/48
2/23/48
L. & H.
*224 Petitioner reacquired legal title to the Johnson properties upon Farms' cancellation of the assignments on November 12, 1949. Each assignment of a realty interest had the pencil notation "not recorded" written thereon, and was delivered to and retained by Hostetler in his capacity as an officer of the respective corporations. Hostetler placed the assignments in the safe located in Produce's office in Nampa, Idaho. On January 2, 1948, Farms purchased the Mamen Ranch in Canyon County, Idaho, for $12,000 and sold it in 1951. L. & H. treated the property as an asset on its books. On January 29, 1948, Farms purchased from Edmund Simmerman and wife 80 acres of land in Canyon County, Idaho, hereafter called the Simmerman property. Clyde Davis loaned $5,500 to Farms and received a mortgage on the property. Both the deed and the mortgage were recorded on May 17, 1948. Farms recorded the mortgage on its books as a property purchase contract. On October 28, 1949, Farms conveyed the Simmerman property to petitioner. The mortgage was paid on November 9, 1949. On January 17, 1949, W. D. Hickman and wife conveyed to Farms land in Canyon County, Idaho, hereafter called the Hickman property. *225 On October 28, 1949, Farms conveyed the Hickman property to petitioner. Both the Hickman and Simmerman conveyances were accomplished by corporate warranty deeds which recited that Farms' directors authorized the conveyances. On November 17, 1949, J. Schaeber conveyed to Farms land in Canyon County, Idaho, which was formerly leased to petitioner. On November 12, 1949, petitioner borrowed $30,000 from the First National Bank of Caldwell, Caldwell, Idaho, and mortgaged the Simmerman, Hickman and Johnson properties. Produce, Farms and L. & H. opened bank accounts on March 12, 1948 and obtained a supply of checks with the corporate names imprinted thereon. The corporations maintained the accounts in 1948 and 1949 and authorized petitioner and Hostetler to draw checks. Separate invoices and stationery were printed for Produce, Farms and L. & H. and letterheads indicated the corporate nature of the respective operations. The stationery of Produce and Farms showed their separate mailing addresses, telephone numbers and P.A.C.A. license numbers which were 113218 and 113217, respectively. During some part of 1948 Produce used invoice forms bearing petitioner's name. On some a line was *226 drawn through petitioner's name and Produce's name was printed with a rubber stamp. Produce subscribed to a trade journal and to a credit rating service. Produce notified the journal that the subscription should be shown in its corporate name. In the first few months of 1948 the Idaho Employment Security Agency and the Oregon Industrial Accident and Unemployment Compensation Commissions regarded petitioner as an employer. Prior to June 30, 1948, Produce filed an initial status report with the Idaho Employment Security Agency, and in July 1948, Produce submitted a supplemental statement to them stating the capital stock interest in Produce. In December 1948, the Oregon Wage and Hour Commission of the Bureau of Labor required L. & H. to make repairs and certain safety improvements to its building at Nyssa, Oregon. Produce and L. & H. furnished the Idaho Department of Agriculture with farm produce broker's bonds. Produce, Farms and L. & H. obtained fidelity bond insurance on various employees. The casualty, business interruption, and comprehensive liability insurance taken out by petitioner in 1947 to cover his individual operations in Idaho and Oregon was canceled pro rata as of *227 January 1, 1948. In 1948 and 1949, Produce, Farms and L. & H. obtained comprehensive liability, casualty and primary commercial blanket bond insurance, and Produce had business interruption insurance. An insurance company reimbursed Farms for property destroyed in 1948. Produce, Farms and L. & H. owned insurance policies on their officers' lives in 1948 and 1949. L. & H.'s Nyssa plant and equipment were destroyed by fire in 1949. The insurance company paid L. & H. $53,137.34, $15,000 of which L. & H. paid to petitioner. Petitioner treated this as a reduction of his capital investment. During the period petitioner carried on individual operations in Idaho and Oregon, he used certain trademarks, some of which were "Max Pack," "Ida Pak," "Western Gem," "Sel-Mor" and "Real West." Petitioner was granted the "Max Pack" trademark in 1945. In 1948, petitioner filed applications with the United States Patent Office for the "Ida Pak" trademark and "Western Gem" trademark. The "Ida Pak" trademark was granted petitioner in 1950 and the "Western Gem" trademark was granted petitioner in 1949. Petitioner permitted Produce and L. & H. to use his trademarks and labels in 1948 and 1949. After the *228 labels bearing petitioner's individual name were exhausted, Produce obtained new labels with petitioner's trademarks imprinted thereon indicating the shipper was Produce. Petitioner participated in the operations of Produce, Farms and L. & H. In May 1948, petitioner transferred funds to the three corporations. He directed Hostetler to furnish corporate financial statements to the Produce Reporter Co., Inc., Chicago, Illinois. In October 1948, petitioner signed checks of Produce to third parties and to L. & H. In January, June and September 1948, petitioner made guaranties of indebtedness incurred or to be incurred by Produce and L. & H. On December 31, 1948, petitioner sold part of his stock in the three corporations as follows: Produce
L. & H.
Farms
Sales of stock: 50 shares
$5,000.00
49 shares
$4,900.00
$4,900.00
Cost of stocks
2,394.50
2,744.98
4,480.56
Profit on sales
$2,605.50
$2,155.02
$ 419.44 In 1949, petitioner wrote letters to Hostetler with respect to the corporate operations and in September 1949 signed 111 payroll checks of Produce. The Idaho Department of Public Works issued to petitioner transportation permits covering 6 *229 trucks for the period of September 8, 1948 to December 1, 1948. The Idaho Department of Law Enforcement, Motor Fuels Bureau, refunded a motor fuels tax to petitioner for the month of January 1948. In 1948, and in a very few instances in 1949, certain ice, automobile, railroad and supply companies billed petitioner individually for corporate goods received and services rendered. Some copies of orders from produce growers were labeled "Max Lutz." Petitioner's books indicate that he paid to creditors of Lutz Produce Co., L. & H. Produce Co., and Lutz Farms Co., $70,530.51 in 1948 and $85,907.87 in 1949, and that he advanced to the same companies $107,895.48 in 1948 and $23,677.80 in 1949, leaving unpaid liabilities of $159,608.43 for 1948 and $103,878.93 for 1949. Robert Dowell, a public accountant employed by petitioner in Texas, examined the books and records of Produce, Farms and L. & H. as of December 31, 1948 and December 31, 1949. He conducted his examination of Produce, Farms and L. & H. as the examination of three operating corporations. He verfied bank account balances, accounts receivable and accounts payable balances, investments in plant and equipment, life insurance *230 policies on officers, accrued expenses and long-term liabilities. At the conclusion of his examination of Produce, Farms and L. & H. as of December 31, 1948 and December 31, 1949, Dowell prepared income tax returns for each of the corporations. The public accountant also prepared the 1948 and 1949 income tax returns filed by petitioner and his wife. The returns filed by Produce, Farms and L. & H. were as follows: Collection
Date
Year of
Name in Which
District Where
Return
Return
Return Filed
Return Filed
Filed
1948
Lutz Produce Co., Inc.
Idaho
7/15/49
* 1949
Lutz Produce Co., Inc.
Idaho
5/26/50
1949
Lutz Produce Co., Inc.
Idaho
10/12/50
1948
Lutz Farms, Inc.
Idaho
7/15/49
* 1949
Lutz Farms, Inc.
Idaho
5/26/50
1949
Lutz Farms, Inc.
Idaho
10/12/50
1948
L. & H. Produce Co., Inc.
Oregon
7/18/49
1949
L. & H. Produce Co., Inc.
Oregon
**
Petitioner and his wife claimed the following losses in their 1948 and 1949 returns: Returns Filed by Lutz and His Wife
1948
1949 l
Original
Amended
Individual
Individual
Joint
Community Loss
Returns
Returns
Return
Max Lutz Produce Account, Nampa, Idaho
$125,103.35
$64,082.36
Max Lutz Produce Account, Emmett, Idaho
4,893.82
Max Lutz Farm Account, Nampa, Idaho
69,981.56
342.51
Max Lutz Produce Account, Nyssa, Oregon
74,367.27
8,972.04
Total
$274,346.00
$289,536.86
$73,396.91
*231 The amount in dispute for 1948 is stipulated to be $274,346. The original 1948 returns contained the following statements: "Information Memorandum "This return includes income and disbursements of business operations in Texas, Idaho and Oregon. The operations in Idaho and Oregon were conducted in the names of three corporations (Lutz Produce Co., Inc., Nampa, Idaho, Lutz Farms, Inc., Nampa, Idaho and L. & H. Produce Co., Inc., Nyssa, Oregon) which were organized in 1948 by this taxpayer and are owned by this taxpayer. Because the Idaho and Oregon corporations were mere names in these business operations, the operations being actually those of Max Lutz personally because resting squarely on his name, credit and reputation, and for other reasons, the income and disbursements of such operations have been included in (this) the 1948 personal income tax return of Max Lutz." The 1949 joint return contained a similar statement. The 1948 amended returns contained the following statement: "During the taxable year, taxpayer paid or assumed certain obligations of three corporations: Lutz Produce Co., Inc., Nampa, Idaho; Lutz Farms, Inc., Nampa, Idaho; and L. & H. Produce Co., Inc., Nyssa, *232 Oregon. These corporations were owned by taxpayer and were engaged in the same type of activity as taxpayer individually (i.e., growing, packaging and shipping fruits and vegetables). Taxpayer paid or assumed these obligations for the purpose of protecting his business reputation and credit standing. Total amount of obligations paid or assumed was $289,536.86." Respondent disallowed the deduction of these losses. The corporate returns filed by Produce, Farms and L. & H. in 1948 and 1949 contained the following statements: "Information Memorandum "The name and facilities of this Corporation were used to transact certain business operations for Max Lutz (residing in McAllen, Tex.) individually. The income and disbursements flowing from these operations have been duly reported in the personal income tax return of the said Max Lutz." Dowell prepared balance sheets for Produce, Farms and L. & H. as of December 31, 1948 and December 31, 1949. The balance sheets as of December 31, 1948 for the three corporations showed that liabilities exceeded assets and losses exceeded capital. The balance sheets which were part of the Forms 1120 filed by Produce, Farms and L. & H. for the year *233 1948 showed that assets exceeded liabilities and that the capital of each was impaired by a small deficit attributable to its respective 1948 operations. The balance sheets as of December 31, 1949 and the balance sheets included in the Forms 1120 filed by the three corporations showed tha the assets exceeded the respective liabilities and that the capital of each was impaired by small deficits. The balance sheets which were a part of the Forms 1120 filed in 1949 by the three corporations did not show the following amounts owed to the corporations by petitioner at December 31, 1949: Corporation
Amount Due
Produce
$129,997.17
Farms
69,981.56
L. & H.
74,367.27 These amounts were treated as accounts receivable of the corporations in Dowell's working papers. The books of the three corporations recorded sales, receipts, purchases and deposits made or received in the names of and on behalf of the respective corporations. Dowell's working papers for the three corporations in 1948 and 1949 showed the following trial balances before year-end adjustments: Produce
Farms
L. & H.
1948
Income: Sales
$878,314.19
$136,222.99
$299,845.30
Storage
6,315.92
Other
Cost of goods sold
963,631.46
208,900.86
358,162.44
Purchases
Expenses
45,780.46
6,619.79
17,012.64
Fire loss
1949
Income: Sales
$549,972.51
$ 11,054.91
$ 72,801.90
Storage
2,327.64
Other
3,665.00
8,500.00
3,568.48
Cost of goods sold
Purchases
348,940.40
53,540.44
Expenses
271,392.87
20,204.75
24,197.21
Fire loss
7,344.22
*234 Dowell prepared a financial statement for petitioner as of October 31, 1949 which was submitted to the McAllen State Bank, McAllen, Texas. The amounts of $773,735.53, $295,438.83 and $478,296.70 represented, respectively, petitioner's assets, liabilities and net worth. The following assets were included on the balance sheet: Current
Lutz, Inc. - Idaho - advances
$245,806.27
Investments and Securities
Lutz, Inc. - Oregon and Idaho
(close corporation)
Capital stock at cost
89,853.97 The following comment appeared in the statement: "Current Assets "The largest item of current assets is the advances to Lutz, Inc., Idaho-Oregon. This account consists of cash and material credit advances. As the operating season ends in Idaho and Oregon each year, these advances are repaid to the Texas operations whose operating season begins at approximately the same date Idaho-Oregon operations cease. Due to storage requirements of Idaho-Oregon operations this year, they were unable to repay as punctually as in the past, however, in order to secure this obligation, the Idaho-Oregon corporations have made collateral assignment of 100 cars of onions in storage and a deed to *235 225 acres of irrigated row-crop land and all buildings thereon, located near Nampa, Idaho. The Idaho-Oregon corporations are completely controlled by Max Lutz ownership of 98% of capital stock." Petitioner's individual books contained an account designated "Max Lutz - Idaho Current Account." The balances in the account at October 31, 1949 and at December 31 from 1949 through 1954 were: Balance of Account at
Amount
October 31, 1949
$149,792.23
October 31, 1949
33,500.00
October 31, 1949
6,007.82
Total
$189,300.05
December 31, 1949
$248,529.30
December 31, 1950
$300,960.85
December 31, 1951
$287,967.34
December 31, 1952
$287,659.79
December 31, 1953
$292,811.58
December 31, 1954
$310,108.58 These amounts were not written off the books as a bad debt until the end of 1952 or 1953, until which time there was pending a request for a Treasury ruling. In 1948 and 1949, Produce, Farms and L. & H. carried on operations in the corporate form that petitioner had formerly carried on as an individual. Payments to or on behalf of the corporations were not proximately related to the conduct of petitioner's proprietorship business. Petitioner did not sustain *236 net operating losses of approximately $75,000 and $30,000 in 1949 and 1950, respectively. Opinion The primary proposition advanced by petitioners, that the corporate entity of the Idaho and Oregon corporations may be ignored, cannot be accepted unless we can overcome two obstacles. The first is that the normal and usual practice is to accept the corporation as a real and separate entity, and that it is only in the exceptional situation tha the law will penetrate through it to the stockholders, New Colonial Ice Co. v. Helvering, 292 U.S. 435, 441-442; Moline Properties v. Commissioner, 319 U.S. 436; National Carbide Corp. v. Commissioner, 336 U.S. 422; Interstate Transit Lines v. Commissioner, 319 U.S. 590; the second is that it is particularly difficult for the creator and originator of the corporation to be the one that urges that its existence be disregarded. New Colonial Ice Co. v. Helvering, supra; Moline Properties v. Commissioner, supra; National Carbide Corp. v. Commissioner, supra; Interstate Transit Lines v. Commissioner, supra.
Here, all of the indications *237 seem to us to call for application of the general rule. There was a reason for the creation of the corporations which petitioner could not have accomplished without them even though his original purpose to permit his principal employees to share in the business profits by allotting stock to them may not have been immediately feasible because of the poor crop season. There is no indication that it was not still his ultimate intention. The corporations could perhaps have been allowed to lie dormant, as in such cases as Thomas K. Glenn, 3 T.C. 328; Mark A. Mayer, 36 B.T.A. 117; cf. Archibald R. Watson, 42 B.T.A. 52, affd. (C.A. 2) 124 Fed. (2d) 437; Paymer v. Commissioner, (C.A. 2) 150 Fed. (2d) 334, reversing in part a Memorandum Opinion of this Court. But instead they actively conducted the business, at least to some extent; the accounts were maintained in their name; they bought and sold property; filed reports with governmental agencies, and otherwise maintained so great an activity that it seems impossible for us to say that the charters were mere pieces of paper. [3] However ambiguous petitioner's intentions may *238 have been at the outset, all of these transactions were conducted by the corporate officers and employees, presumably with his consent, sometimes with his participation, and certainly without his objection. *239 And petitioner, himself, apparently recognized that it was within his power to rely on the insulation of the separate corporate existence and to avoid paying the corporate obligations. [4] He, himself, must have viewed them as actual and existing organizations severable from his own personal situation, and we feel compelled to do likewise. *240 Disposition of petitioner's first contention in effect decides his second. He had a capital asset in the form of the majority stock in his three corporations. By keeping them alive he accomplished the preservation and future potential of this capital asset. What he advanced to the corporations or for their account was in the nature of an additional capital investment and cannot be deducted as a current expense. Eskimo Pie Corporation, 4 T.C. 669, affirmed per curiam (C.A. 3) 153 Fed. (2d) 301; H. William Ihrig, 26 T.C. 73. This is not similar to a situation where the interest in some other business has already become worthless and has been abandoned, cf. Scruggs-Vandervoort-Barney, Inc., 7 T.C. 779; L. Heller & Son, Inc., 12 T.C. 1109; Edward J. Miller, 37 B.T.A. 830; nor where the other business is a nonprofit organization to which the concept of capital investment and future gain will be inapplicable. Charles J. Dinardo, 22 T.C. 430. These corporations continued their existence during both of the tax years before us, and for all that appears persisted and throve in the subsequent *241 years. Regardless of any incidental effect on petitioner's personal business or credit, the acquisition or preservation of petitioner's capital requires that the deduction be disallowed. Carl Reimers Co., 19 T.C. 1235, affd. (C.A. 2) 211 Fed. (2d) 66. Even if the payments in question could be considered as loans or advances to the three corporations rather than an additional capital investment by petitioner, there is no showing that they became worthless in either of the years before us. The implication is to the contrary since, as we have said, the corporations continued to exist and function, and in fact the evidence indicates that they were solvent. There is no suggestion that the debts became partially worthless, no proof to support such a proposition, and certainly no showing of any partial chargeoff. Finally, petitioner insists that the payments were ordinary and necessary expenses of his personal business because under the Perishable Agricultural Commodities Act, 1930, 46 Stat. 531, as amended, 7 U.S.C. sec. 499, et seq., (1946 ed.)[5] he would not have been permitted to retain his personal license as a provision merchant *242 if the corporations were allowed to default. We do not so read the statute and no cases or rulings are cited to us which would support any such contention. Petitioners' claim for loss carrybacks requires no further discussion since there was no cognizable loss. Decisions will be entered for the respondent. Footnotes
1. Statements to this effect in the stipulation of facts were objected to at the trial by petitioners. Decision on the objection was reserved with the privilege to petitioners to develop any objection to the admissibility of the documents in their brief. No argument as to admissibility having been submitted, the finding that the documents were executed is made as the evidence indicates. ↩
2. See Footnote 1, supra. ↩
*. Not shown by the record.↩
*. Tentative return. ↩
**. Not shown by the record.↩
3. Respondent summarizes the corporate operations, with general support in the record, as follows: "1) the notification to prospective creditors of the impending incorporation of Produce, Farms, and L. & H.; 2) the grant of corporate charters to Produce and Farms, by Idaho and to L. & H. by Oregon; 3) Lutz' transfers to Produce, Farms, and L. & H., immediately after incorporation, of the physical assets, including land, which would be needed in their operations; 4) the establishment, maintenance and expansion, as needed, of complete accounting systems to reflect the operations of the corporations; 5) the establishment and use during 1948 and 1949 of corporate bank accounts into which were deposited proceeds from corporate sales and from which were withdrawn funds that were required to pay corporate debts; 6) the obtaining by each corporation of all forms of business insurance which were appropriate to their operations, including life insurance on their respective officers; 7) the use of stationery and business forms which clearly indicated the corporate nature of the operations of Produce, Farms, and L. & H.; 8) the sale by the corporations in their own names of fruits and vegetables bought or grown by them; 9) the purchase by the corporations in their own names of materials needed by them; 10) the negotiation with sellers for the purchase of real estate for cash, on land contract or with mortgage loan funds received contemporaneously with the purchase of the properties; 11) the sale and transfer by the corporations of their real estate; 12) the notifications sent to trade journals, credit agencies and governmental agencies that the corporations were actually carrying on operations; 13) the furnishing of financial information pertaining to the corporations to credit agencies; and 14) the treatment of Produce, Farms, and L. & H. as operating corporations by the public accountant who examined their records and prepared a report based thereon."↩
4. Petitioner testified: "Q. Was it ever suggested to you that you default on those by letting the corporations veil you? "A. Yes, sir. "* * * "A. Well, in the end of '48, either the end of November or early December, I don't recall, we had a meeting in Nampa, Idaho, Dewey Palace Hotel, between Karl Hostetler and Glen Hoel and myself and - "* * * "A. * * * Those gentlemen, after talking about it for two or three hours, told me I had no alternative but to go through bankruptcy and to save myself. I listened to the story and I told them I would let them know in a day or two and to please run me off a sheet as quick as they could of the amounts [of] indebtedness that the company owed at this time, what I was indebted to. They did this. "* * * "Q. What were your intentions, Mr. Lutz, with relation to advances to the corporations and the payments made by you direct to the creditors of the corporations? "A. To keep my credit standing and to keep my personal reputation with the trade throughout the country * * *. "* * * "A. No other reason than to keep up my credit * * * and keep my license in effect and hoping that my creditors would give me a chance to keep operating, which they have so far."↩
5. Sec. 499d(b). "The Secretary shall refuse to issue a license to an applicant (1) if he finds that the applicant has previously been responsible in whole or in part for any violation of the provisions of the chapter for which a license of the applicant, or the license of any partnership, association, or corporation in which the applicant held any office or, in the case of a partnership, had any share or interest, was revoked under the provisions of section 499h of this title; or (2) if at any time within two years he has found after notice and hearing that said applicant was responsible in whole or in part for any flagrant or repeated violation of the provisions of section 499b of this title; * * *."↩